In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-1754, 06-2380 & 06-2821

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GERARDO RECENDIZ, ARMANDO NAVAR, and
MARCO THOMAS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 1136—**Charles R. Norgle**, *Judge.*

ARGUED OCTOBER 20, 2008—DECIDED MARCH 3, 2009

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* On October 3, 2005, a jury con-
victed Armando Navar and Marco Thomas of a number of
federal crimes related to their participation in a Chicago
cocaine distribution network. The district court sentenced
Navar and Thomas to 324 and 360 months in prison,
respectively. On appeal, Navar challenges his conviction,

arguing that the district court made several evidentiary and procedural errors and that his counsel was ineffective. Thomas joins only Navar's assertion that trial counsel improperly shifted the burden of proof during his opening statement, in violation of his Fifth Amendment right to due process. We find no error below and affirm both convictions.

Co-defendant Gerardo Recendiz pleaded guilty to multiple charges related to his participation in the same drug distribution network and was sentenced to 135 months in prison. Recendiz's attorney filed an *Anders* brief requesting permission to withdraw from representing Recendiz. We grant the motion to withdraw and dismiss Recendiz's appeal.

## I. BACKGROUND

Armando Navar and Marco Thomas were members of a drug trafficking organization that smuggled substantial quantities of cocaine from Mexico into the United States and distributed it on the streets of Chicago. The organization's leader was Saul Saucedo, who resides in Mexico and oversees his organization from afar.

### A. The Cast of Characters

Armando Navar is originally from Mexico, and he is married to Saul Saucedo's sister, Lorena. Before coming to the United States, Navar worked as a physician and was known as "the Doctor" within the Saucedo organization.

During the relevant time period, Navar worked for Saucedo as a high-level operative in Chicago. In this capacity, Navar aided in the delivery of multi-kilogram quantities of cocaine from Mexico, where they were stored in stash houses around the city. Navar assisted in distributing large amounts of the cocaine to brokers for the organization, who sold it to wholesale dealers, who in turn distributed the drugs to their street-level, paying customers. Couriers delivered the proceeds back to higher-ranking members of the organization, who allocated the profits and eventually smuggled the remainder back to Saucedo in Mexico. The drug operation was vast, involved hundreds of kilograms of cocaine, and generated millions of dollars.

One broker for the Saucedo organization was a man named Jesus Herrera. Navar first met Herrera in 1997, when Herrera began dating Navar's sister-in-law—Saul Saucedo's younger sister—Cynthia. Navar disapproved of the relationship and distrusted Herrera because he was from a disfavored town in Mexico and was older than Cynthia. Navar confronted Herrera on one occasion and barred Cynthia from seeing him, largely out of respect for her father, who had entrusted her to Navar's care. Following his intervention, Navar did not communicate or interact with Herrera for some time.

Years later, Herrera began purchasing cocaine from the Saucedo organization. Herrera initially dealt with an operative named Gabe, but Navar assumed this business following Gabe's arrest. From late 2002 until mid-September 2003, Navar sold cocaine to Herrera approximately two

to three times per month, in average quantities of ten to fifteen kilograms. Herrera owned a furniture store on the west side of Chicago, but he attempted to keep his drug business separate and leased a nearby warehouse to conceal cocaine.

Concerned for his reputation, business, and safety, Herrera enlisted Ahmed "Eddie" Tmiri as his primary assistant in carrying out the drug transactions. Tmiri had worked for Herrera in the furniture store for six years before joining the drug operation. Typically, after Herrera arranged a sale, Tmiri picked up the money and delivered the cocaine to the buyer, allowing Herrera to distance himself from the criminal activity. Because of Tmiri's assistance, Herrera split with him the profits earned from each transaction.

Herrera sold cocaine to many different dealers, one of whom was Navar's co-defendant Marco Thomas. Herrera sold cocaine to Thomas from the spring of 2003 until their last transaction on September 3, 2003. The transactions occurred approximately two or three times per month, each in an amount of approximately ten to fifteen kilograms of cocaine.

### B. The Drug Busts

Near the beginning of 2003, the Drug Enforcement Administration began investigating the Saucedo organization after the DEA's Colorado Springs office intercepted phone conversations of a known money carrier, who revealed that he was making a trip to Chicago to pick up

anywhere from $1 million to $2 million. The DEA's Chicago office took over the investigation in mid-2003.

During the course of the investigation, the DEA obtained permission to wiretap multiple telephone numbers associated with members of the Saucedo organization. Among these telephone numbers was a prepaid cellular phone used by Jesus Herrera. Herrera testified that he communicated with Navar and Thomas primarily via prepaid phones referred to as "throwaways," which allowed users to avoid providing identifying information associated with a regular cellular phone account and, at least theoretically, to avoid wiretaps.

Herrera's efforts to evade a wiretap were unsuccessful. Between August 1 and September 15, 2003, the DEA recorded approximately 530 telephone calls on Herrera's number. Of these, the government introduced as evidence at trial sixty-five conversations related to drug transactions: thirty-nine calls between Herrera and Navar, and twenty-six calls between Herrera and Thomas. The conversations revealed the details of various drug deals, most often communicated using code language. Herrera explained that they avoided the word cocaine but discussed quantities, the price per kilogram, their typical terms or "standing orders," and meeting places for delivering the drugs.

Based upon these conversations and additional surveillance, the DEA learned of an upcoming drug transaction involving Navar and Thomas. On September 2, 2003, Navar informed Herrera that cocaine was available, and Herrera reserved ten kilograms. Herrera called Thomas to

inform him of the cocaine and coordinate an exchange for the next day. On September 3, Herrera confirmed the transaction with both Thomas and Navar. Just before noon, Thomas called Herrera's courier, Tmiri, and the two arranged a meeting at a restaurant to exchange the money. DEA agents observed the exchange of a duffel bag and followed both Thomas and Tmiri when they departed. Tmiri proceeded to a White Hen Pantry, where he collected a package from a white minivan carrying two Hispanic men, and the two vehicles quickly separated and left. The minivan proceeded to what was later discovered to be a stash house; agents followed Tmiri's car to an apartment on the west side of Chicago. At that point, Thomas reappeared, parked beside Tmiri, and removed a box from Tmiri's trunk. Tmiri testified that Thomas took the box into the apartment building, which belonged to Thomas's sister, and then both men drove away.

Following this exchange, law enforcement stopped both Tmiri and Thomas. In Thomas's Cadillac Escalade, agents discovered a loaded semiautomatic handgun, two plastic bags containing cocaine, and approximately $23,500 in cash. Investigators later learned that Thomas had repeatedly deposited proceeds into four different bank accounts in amounts just below $10,000, to avoid bank disclosure rules. An IRS Special Agent testified at trial that agents also discovered $498,500 cash in Thomas's safe deposit box, $87,000 in three separate hiding places in Thomas's home, a .357 Magnum, a .9mm handgun, a money-counting machine, and documents that appeared to be drug ledgers.

The DEA continued to monitor phone calls between Navar and Herrera. The next day, September 4, Herrera informed Navar that they "had a problem with the dogs," which he explained at trial meant the police. Herrera suggested that they move their drugs to another location. Law enforcement followed the trail, and on September 15, agents stopped a white van leaving the new location with 21 kilograms of cocaine. A search of the stash house revealed over 500 kilograms of cocaine hidden in the floorboards and the attic, as well as weapons, equipment for pressing and packaging cocaine, and a drug ledger. The DEA arrested Herrera, who provided information about "the Doctor" that led to Navar's identification and arrest. Herrera also identified Navar's voice on a number of the recorded calls between him and Navar.

On April 1, 2004, a grand jury indicted eleven individuals who were involved in the conspiracy to distribute drugs for the Saucedo organization. The indictment charged Armando Navar with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, distribution of more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), and three counts of using a communication facility during a felony in violation of 21 U.S.C. § 843(b). The indictment charged Thomas with the same conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 and a number of other related counts.

On September 20, 2005, a jury trial began in the United States District Court for the Northern District of Illinois. Prior to trial, Herrera and Tmiri accepted plea agreements and agreed to testify against Navar and Thomas. The

government also called law enforcement agents involved in the investigation. On October 3, 2005, a jury found both defendants guilty of each count of the indictment. On May 9, 2006, the district court sentenced Navar to 324 months' confinement; on June 16, 2006, Thomas received 360 months. Both filed timely notices of appeal, and we consolidated their appeals.

## II. ANALYSIS OF THE CONSOLIDATED APPEALS OF NAVAR AND THOMAS

In his brief, Navar presents no fewer than ten issues for our review. Among them are a variety of alleged evidentiary and constitutional errors, as well as an ineffective assistance of counsel claim based upon his trial attorney's failure to address some of these alleged errors. We will address the bulk of Navar's arguments. Thomas joins only Navar's first argument regarding counsel's remarks during his opening statement. Because Navar bases his ineffective assistance of counsel claim on three issues similar to those he challenges substantively, we will address the merits of his individual arguments first, then turn to the ineffective assistance claim.

### A. Defense Counsel's Comments During His Opening Statement

Navar's first argument, which Thomas joins, is that Navar's counsel made certain comments during his opening statement that improperly shifted the burden of proof, thereby violating the defendants' Fifth Amendment right to due process. The following exchanges regarding

the burden of proof occurred in front of the jury at trial.

During her opening statement, the prosecutor correctly informed the jury that the government must prove the charges beyond a reasonable doubt, which she explained "is the standard of proof in . . . every criminal case in the city of Chicago." Following the government's statement, Navar's counsel gave his opening statement, in which he made the following remarks to the jury regarding the burden of proof:

> Members of the jury, Mr. Hyman and I, Larry and I, intend to prove to you—that's right, we who have no burden, it's true. As you heard my adversary say, Ms. Noller and his Honor will tell you again, instruct you later . . . that the government has the burden of proof beyond a reasonable doubt in every criminal case. But in this case, members of the jury, I will respectfully tell you now that we appreciate those advantages, but we don't want those advantages. He is presumed innocent, that's true, but we don't want any advantage at all because we will confidently prove to you . . . by the end of this case that Armando Navar is an innocent person and being set up and being framed by a person who has an absolute visceral hate for Armando Navar.
>
>     . . . .
>
> I'm going to prove to you that Armando Navar meddled in a relationship between Herrera and Armando Navar's sister-in-law, because he at some point, many times, told his sister-in-law that Herrera wasn't good enough for her. . . .

. . . .

> I will competently prove—we will competently
> prove to you that Armando Navar is not a drug
> dealer, that the indictment is a false accusation . . .
> .

These are the comments that Navar challenges in this
appeal. Following Navar's opening statement, Thomas's
counsel correctly stated that Thomas must be guilty
beyond a reasonable doubt and also noted that "[t]he
government welcomes their burden of proof; it's your job
to hold them to their burden of proof."

During closing argument at the end of the trial, both the
prosecutor and Thomas's counsel again stated the correct
burden of proof. Navar's counsel, perhaps reassessing the
strength of his case, abandoned the bravado displayed in
his opening statement and referred to the correct burden of
proof no less than *nine* different times during his closing
argument. Finally, the district court gave the jury a de-
tailed charge explaining that the defendants are presumed
innocent and must be proven guilty beyond a reasonable
doubt.

Navar now asserts that trial counsel's comments during
his opening statement were improper. Navar argues that
even though "the defense did not make a motion for a
mistrial because the defense made the improper argu-
ment . . . , the court itself should have stopped the proce-
dure and had a mistrial declared." (Petr.'s Br. 19.) We find
Navar's argument unconvincing. Not surprisingly, Navar's
counsel did not stop his opening statement to lodge an
objection to his own comments; Thomas also did not object.
Thus, we review for plain error. *See* Fed. R. Crim. P. 52(b);

*United States v. Sandoval-Gomez*, 295 F.3d 757, 762 (7th Cir. 2002). In determining whether plain error exists, we ask (1) whether there was any error at all; (2) if so, whether that error was plain, i.e., clear or obvious; and (3) if the error was plain, whether it affected defendant's substantial rights, i.e., whether it affected the outcome of the case. *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

Placed in the full context of the trial, which included the above statements, Navar's argument borders on frivolity. First, we agree with the government that the appropriate avenue to address these types of alleged misstatements by one's own counsel is via a Sixth Amendment claim for ineffective assistance. Navar brought such a claim and included his counsel's comments as one basis for it, which we address below. Thomas, of course, cannot bring an ineffective assistance claim based upon the conduct of another co-defendant's attorney. Thus, we consider the merits of defendants' claims and find that they fail.

In support of his argument, Navar analogizes his counsel's remarks only to cases involving inappropriate comments by a prosecutor, and he invites us, without legal support, to apply the same standard of conduct to defense counsel. (Petr.'s Br. 21 (citing *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978); *United States v. Segna*, 555 F.2d 226 (9th Cir. 1977)).) However, overturning a conviction due to a *prosecutor's* improper comments is no easy feat. *See United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003) (noting that to constitute prosecutorial misconduct, comments must be both improper and deprive defendant of a fair trial); *Sandoval-Gomez*, 295 F.3d at 763 (listing

numerous factors a court considers to determine whether defendant was denied a fair trial); *see also United States v. Amerson*, 185 F.3d 676, 685 (7th Cir. 1999) (noting that a prosecutor's improper comments, even at closing argument, "rarely rise to the level of reversible error" (quotations omitted)). Navar's attempt to obtain a new trial because *his counsel's* comments purportedly deprived him of a fair trial is decidedly more difficult.

Navar's first obstacle to success is to convince us that the standards that apply to a prosecutor's comments should apply with equal force to defense counsel's. We do not agree with the comparison. In a criminal case, the prosecutor is in the unique position of representing the government, as opposed to advocating on behalf of a client. As the Supreme Court observed: "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Therefore, a prosecutor's statements—and their impact— are evaluated in a different light than those made by defense counsel, for a jury must have confidence in the prosecutor's faithful observation of the "duty to refrain from improper methods calculated to produce a wrongful conviction." *Id.*

But even more damaging to Navar's claim is that even if defense counsel could make such a strong statement regarding the burden of proof so as to violate his own

client's constitutional rights, Navar's counsel made no such statement here. His comments were merely confident assertions regarding the strength of his case and did not shift the burden of proof or confuse the jury. He also referred to the correct burden multiple times, thereby ameliorating any possible self-inflicted prejudice. *See Sandoval-Gomez*, 295 F.3d at 763 (stating that one factor in determining whether a defendant was denied a fair trial due to a *prosecutor's* remarks is the defense's opportunity to counter any prejudice). Thomas's counsel and the prosecutor both stated the proper burden of proof, and the court gave the jury the correct instruction, which we assume it understood and followed. *See Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir. 1996); *Bae v. Peters*, 950 F.2d 469, 481 (7th Cir. 1991); *see also Boyde v. California*, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence . . . ; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (citation omitted)).

Consequently, Navar's argument fails; he does not present any error, much less a plain one affecting substantial rights. *See Olano*, 507 U.S. at 733-34. Even if the statements were improper under the standard applicable to a prosecutor's misstatements, they did not deprive Navar of the right to a fair trial, i.e., they did not "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Kappos v. Hanks*, 54 F.3d 365, 367 (7th Cir. 1995) (quoting *Darden v. Wainwright*,

477 U.S. 168, 181 (1986)). Thomas merely adopted Navar's argument, and his claim fails for the same reasons.

### B. Identification Testimony

Next, Navar challenges certain identification testimony provided by two witnesses during the trial. A witness's identification violates a defendant's right to due process when the identification procedure is "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Williams*, 522 F.3d 809, 810 (7th Cir. 2008) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). To determine whether a particular procedure violated a defendant's constitutional rights, we undertake a well-settled, two-pronged analysis: (1) whether the process was unduly suggestive, and (2) if so, whether the identification was nevertheless sufficiently reliable. *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007); *Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 (7th Cir. 1987).

In conducting this analysis, we must remember that our purpose is only to determine whether the district court properly permitted the jury to hear the identification testimony. We will not assess the accuracy of the actual identification, for that is the exclusive province of the jury. *Kosik*, 814 F.2d at 1156. Our role, rather, is to determine whether the identification was so unreliable that the defendant's constitutional right to a fair trial should have precluded its admission. *Id.*

We generally review a district court's decision not to suppress identification testimony *de novo*, with due deference to its findings of fact. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). However, because Navar's counsel did not object to either identification, we review for plain error. *Sandoval-Gomez*, 295 F.3d at 762; *see also supra* pt. II.A. Navar first argues that the trial court erred by permitting a witness to leave the witness stand to identify Navar as the individual known as "the Doctor." His second challenge is that the trial court should not have permitted a law enforcement officer to identify Navar's voice on a previously recorded conversation between Navar and Herrera. We consider separately whether each procedure was proper.

1.   *Ahmed Tmiri's In-Court Identification of Navar as "the Doctor"*

During the trial, Ahmed Tmiri testified that he delivered drugs and collected money for Jesus Herrera. He stated that Herrera began obtaining drugs from someone known as "the Doctor," whose real name was "Navarro." Toward the beginning of his testimony, when asked whether he saw "the Doctor" in the courtroom, Tmiri replied that he did not. However, he testified that he had seen "the Doctor" more than twenty times and described his physical characteristics: "He's dark skin, he's got a mustache, black hair, kind of straight, and I think he's got a little scar on his face." Tmiri was also unable to identify Thomas, despite the fact that both defendants were seated at the defense table. Later in his testimony, however, Tmiri explained

that he had broken his glasses prior to the trial and could not even make out the facial features of the prosecutor who was questioning him.

Toward the end of Tmiri's testimony, the prosecutor requested permission from the court for Tmiri to leave the witness stand and move closer to the people in the court-room to determine whether he recognized anyone. Navar's counsel consulted with Thomas's counsel, but neither objected to the procedure. With the court's consent, Tmiri left the stand and identified both Navar and Thomas. Navar contends that this procedure violated his right to due process by improperly suggesting to Tmiri that he identify Navar.

First, we must determine whether the in-court identifica-tion procedure was so suggestive that it likely produced an unreliable identification. In the courtroom, a defendant does not have a constitutional right to the same type of identification procedure used in a police line-up, and the manner of an in-court identification is typically left to the trial court's discretion. *United States v. Davies*, 768 F.2d 893, 903-04 (7th Cir. 1985). Navar's argument boils down to two allegedly suggestive circumstances: first, that Navar was seated at the defense table; and second, that the prosecutor's request for Tmiri to move closer to the audience—after Tmiri had already stated that he could not identify Navar—suggested that "the Doctor" was in fact in the courtroom.

As to the first, we have indicated on multiple occasions that a defendant's mere presence at the defense table is not enough to establish a violation of due process. *United*

*States v. Bush*, 749 F.2d 1227, 1232 (7th Cir. 1984); *accord Johnson v. McCaughtry*, 92 F.3d 585, 597 (7th Cir. 1996); *Rodriguez*, 63 F.3d at 556; *United States ex rel. Haywood v. O'Leary*, 827 F.2d 52, 59 (7th Cir. 1987). Nothing here requires us to deviate from that general rule. Similarly, simply increasing a witness's proximity to the individuals in the courtroom, without more, does not suggest to a witness whom he should identify. As we have stated, "[t]o satisfy the first prong of our analysis, the defendant must show both that the identification procedure was suggestive and that such suggestiveness was unnecessary." *Hawkins*, 499 F.3d at 707. Because Tmiri testified that he could not see, permitting him to move forward was a necessary step for him to make *any* identification. Even the sequence of the questioning itself was necessary, for no one in the courtroom was aware that Tmiri could not see without his glasses until after he was initially unable to identify Navar and Thomas. Nothing about the sequence of the questions suggested to Tmiri whom he should identify or that Navar was in fact present.

Even if we determined that the procedure at trial was unduly suggestive, it was sufficiently reliable to prevent "'a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (quoting *Simmons*, 390 U.S. at 384). The Supreme Court has said that "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). In assessing whether an identification was reliable, a court should consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime (or prior to the identification), (2) the

witness's degree of attention during such an opportunity, (3) the accuracy of the witness's prior description of the criminal, if he made one, (4) the level of certainty demonstrated at the time of the identification, and (5) the time between the crime and the identification. *See id.* at 114 (citing *Biggers*, 409 U.S. at 199-200).

After evaluating the totality of the circumstances and applying the *Biggers* factors, the circumstances in this case support the reliability of Tmiri's identification. Tmiri testified that he knew Navar and had seen him over twenty times, providing him ample opportunity to view Navar prior to trial. Tmiri did not testify regarding his degree of attention during the times he saw Navar, nor did he provide a description of Navar prior to trial, but Tmiri did provide a detailed description of Navar prior to his visual identification of him. Navar does not contest the accuracy of this description, nor does he suggest that the description itself was the result of any suggestive circumstance. Tmiri exhibited no uncertainty at trial that Navar was in fact "the Doctor." Regarding the last factor, the trial occurred approximately two years after Tmiri last interacted with Navar,[1] but any concern over that length of time is diminished by the strength of the other factors—particularly Tmiri's familiarity with Navar and his specific description of him.

---

[1] The record is not clear whether this was the last time Tmiri actually saw Navar. Although it may be possible that Tmiri saw Navar after that time, we use this time frame for the purposes of this analysis.

Furthermore, Tmiri's testimony and ultimate identification occurred in direct view of the jury, which observed and presumably weighed any arguably suggestive circumstances. As we noted, our role is not to judge the accuracy of the identification, *Kosik*, 814 F.2d at 1156, and such testimony should be kept from the jury *only* if it is so unreliable that it presents "a very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384. "Misidentification is 'irreparable' when the source of the error is so elusive that it cannot be demonstrated to a jury, which therefore will give excessive weight to the eyewitness testimony." *Williams*, 522 F.3d at 811. We have also noted that "[t]he deference shown the jury in weighing the reliability of potentially suggestive out-of-court identification would seem even more appropriate for in-court identifications where the jury is present and able to see first-hand the circumstances which may influence a witness." *Bush*, 749 F.2d at 1231. In circumstances such as these, where the in-court identification was not tainted by a previous out-of-court identification, the jury is in the unique position of observing the entire identification procedure, and it may weigh the accuracy of the identification accordingly. The jury's conclusions are not our concern, so long as the procedure used to identify Navar was not unduly suggestive and produced a sufficiently reliable identification. The procedure used here did not violate Navar's constitutional rights, and the district court did not err by permitting Tmiri's in-court identification.

2. *Special Agent Tulshi's Voice Identification*

Navar also asserts that the trial court erred when it permitted DEA Special Agent Tulshi to identify Navar's voice on a recorded conversation between Navar and Herrera. Tulshi testified that on the day of Navar's arrest, he listened to Call No. 331, which was a six-minute conversation in Spanish between Herrera and a man whose voice Tulshi did not yet recognize. Later that day, Tulshi, who speaks Spanish, participated in Navar's arrest and post-arrest interviews and conversed with Navar. Tulshi testified that after hearing Navar speak, he recognized Navar's voice as the second speaker on Call No. 331. Navar now contends that the identification (1) lacked foundation, particularly because the trial court had no basis for qualifying Tulshi as an expert witness, and (2) was unduly suggestive in violation of Navar's constitutional right to due process.

a. *Foundation for Special Agent Tulshi's Identification*

Although Navar's brief is somewhat unclear, it appears that he claims that Special Agent Tulshi's lack of training in voice identification should render his testimony inadmissible. Thus, we first review whether Tulshi properly authenticated his voice identification.

Federal Rule of Evidence 901 governs the authentication of evidence as a precondition to admissibility, and subsection (b) provides examples of acceptable methods of authentication or identification. According to the applicable illustration, a witness properly authenticates a voice,

"whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice *at any time* under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5) (emphasis added). The advisory committee commented on the illustration in Rule 901(b)(5), stating that because "aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired *either before or after* the particular speaking which is the subject of the identification." *Id.* advisory committee's note (Subdivision (b), Example (5)) (emphasis added).

In light of Rule 901, Navar's contention that the court erred in admitting Special Agent Tulshi's identification because he was not qualified as an expert is wholly meritless. Not only do the advisory committee notes to Rule 901(b) state that voice identification is "not a subject of expert testimony," but this court has previously stated that expert testimony is not required to authenticate a voice identification. *See United States v. Magana*, 118 F.3d 1173, 1208 (7th Cir. 1997) ("'As long as the basic requirement of familiarity with the voice is met, lay opinion testimony is an acceptable means for establishing a speaker's identity.'" (quoting *United States v. Vega*, 860 F.2d 779, 788 (7th Cir. 1988))); *United States v. Degaglia*, 913 F.2d 372, 375-76 (7th Cir. 1990).

Further, Special Agent Tulshi properly established the requisite "minimal familiarity" with Navar's voice to permit him to identify it on Call No. 331. *See United States v. Mansoori*, 304 F.3d 635, 665 (7th Cir. 2002) (holding that a witness who heard defendants' voices once during a

court proceeding satisfied the "minimal familiarity" requirement); *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995); *Degaglia*, 913 F.2d at 376. Tulshi testified that he listened to a recorded phone conversation between Herrera and another speaker on the same day that he arrested Navar. Later that day, he spoke with Navar during his arrest and post-arrest interview, each of which connected Navar's voice to his identity. Tulshi then testified at trial that based on hearing Navar's voice in person, he recognized it as the same voice he heard on Call No. 331. Tulshi's testimony falls squarely within the requirements of Rule 901(b)(5), and the trial court properly found that Tulshi authenticated his identification.

### b.   *Suggestiveness of Special Agent Tulshi's Voice Identification Procedure*

Navar also contends that Special Agent Tulshi's testimony violated his Fifth Amendment right to due process because the voice identification was unduly suggestive. In addition to the testimony recounted above, Tulshi testified that he was asked to listen to Call No. 331 "in order to do a voice recognition." The crux of Navar's argument is that the government's request, which came on the same day that Tulshi knew the authorities were going to arrest Navar, impermissibly suggested that the voice on the call was Navar's.

A witness's voice identification is subject to the same due process analysis as other forms of identification. *See United States v. Alvarez*, 860 F.2d 801, 810 (7th Cir. 1988). As we

previously noted, *supra* pt. II.B.1., in determining the admissibility of identification testimony, "reliability is the linchpin," *Brathwaite*, 432 U.S. at 114, and an identification procedure is unduly suggestive if it "give[s] rise to 'a very substantial likelihood of irreparable misidentification,'" *Degaglia*, 913 F.2d at 376 (quoting *United States v. Carrasco*, 887 F.2d 794, 806 (7th Cir. 1989)). To assess the reliability of a voice identification, we apply the same factors articulated in *Biggers*, and we must weigh them against the "corruptive effect of the suggestive identification." *Alvarez*, 860 F.2d at 810 (quotations omitted).

We disagree with Navar that the procedure used to identify his voice on Call No. 331 was so suggestive that it violated his constitutional rights. Navar presents nothing beyond the sequence of events to indicate that the process suggested to Tulshi that Navar was a participant on Call No. 331.

But even if the identification procedure was suggestive, it was constitutionally reliable. *See Biggers*, 409 U.S. at 199-200; *supra* pt. II.B.1. Applying the first *Biggers* factor, Special Agent Tulshi heard Navar's voice in person on the day of his arrest, and he also had a clear opportunity to listen to the voice on Call No. 331—the call lasted six minutes and was a recording. *Cf. Brown v. Harris*, 666 F.2d 782, 787 (2d Cir. 1981) ("Witnesses who listen to a crime that has been 'memorialized on tape,' are in a position to offer uniquely reliable testimony. . . . [T]hey have the luxury of listening to the tape in an office, where they can devote their full attention to it." (citations omitted)). As to the second factor, Tulshi testified that he listened to

Call No. 331 with the express purpose of remembering the then-unidentified voice. Knowing that as a special agent his recollection would be subject to close scrutiny at trial, Tulshi devoted proper attention to the call, making him nothing like "a casual or passing observer." *Brathwaite*, 432 U.S. at 115. Third, because Tulshi's familiarity with Navar's voice came from a recording of the telephone call, the accuracy of the voice is clear. Regarding the fourth factor, Tulshi expressed no uncertainty that, after hearing Navar's voice during his arrest and post-arrest interview, the voice on Call No. 331 belonged to Navar. And last, the fifth factor also favors admissibility because Tulshi listened to Call No. 331 on the same day that he participated in Navar's arrest.

Therefore, each of the *Biggers* factors weighs in favor of upholding the admission of Tulshi's testimony. Any remaining concerns regarding the accuracy of Tulshi's *recollection* of the voice are relevant to the weight of the testimony, not its admissibility. After reviewing the circumstances of Special Agent Tulshi's voice identification, we cannot say that there is a "'very substantial likelihood of irreparable misidentification.'" *Brathwaite*, 432 U.S. at 116 (quoting *Simmons*, 390 U.S. at 384).

### C. *Law Enforcement Testimony Regarding Wiretap Procedure*

Navar's next challenge is that the court should not have permitted a government agent to explain the process by which he obtained permission to wiretap Jesus Herrera's telephone number. At trial, Special Agent Baumgartner testified that to receive permission to intercept telephone

calls, he prepared an affidavit that included probable cause to believe that the particular phone was being used to conduct drug trafficking crimes. Baumgartner sent the affidavit to the United States Attorney's office and the Department of Justice in Washington D.C., and after they approved it, he submitted it to the district court. Navar's counsel objected to testimony regarding the district court's approval of the wiretap, and he asserts on appeal that this evidence was prejudicial and violated his right to due process. We review the trial court's evidentiary decision, over Navar's objection, for an abuse of discretion. *United States v. Owens*, 424 F.3d 649, 653 (7th Cir. 2005).

Navar is correct that in some circumstances, detailed testimony regarding the process by which the government procures a wiretap is improper and may merit a new trial. *See, e.g., United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006). In *Cunningham*, a government agent testified about the numerous levels of approval required to obtain a wiretap on the defendant's telephone number, including a "very extensive" probable cause affidavit, review by the USAO and a "panel of attorneys" at the DOJ, and then approval by the district court. *Id.* at 710-11. We held that this testimony was irrelevant and unfairly prejudicial because the "government witness was improperly vouching for how good the evidence was." *Id.* at 713. Our concern in *Cunningham* was that the testimony permitted the jury to infer that the defendant was engaged in illegal activity *before* the wiretap because law enforcement, government attorneys, and a district judge each approved it. *See id.; see also United States v. Bustamante*, 493 F.3d 879, 888 (7th Cir. 2007)*.*

Unlike in *Cunningham*, however, the impermissible inference from this type of testimony is missing when the government places a wiretap on a phone belonging to someone other than the defendant. We addressed this issue squarely in *Bustamante* and noted that testimony regarding a wiretap on a co-conspirator's telephone permitted a jury to infer that the *co-conspirator* was engaged in illegal activity before the wiretap. 493 F.3d at 888. Because the defendants in that case never denied that the co-conspirator was a drug dealer, we held that the testimony did not damage or prejudice the defendants. *Id.*

We find the facts of this case analogous to those in *Bustamante*. Baumgartner testified about the wiretap on Herrera's telephone number,[2] and Herrera testified that the telephone number in question belonged to him, a fact Navar has never challenged. The testimony regarding the wiretap procedure was relevant to *Herrera's* conduct and the likelihood that he was involved in illegal activity prior to the wiretap. Herrera was a known drug dealer, a fact that no party disputed. In fact, Navar's trial strategy included painting Herrera as an active participant in the drug conspiracy who was now testifying against Navar to receive a lower sentence. Thus, the impermissible inference that was the concern of *Cunningham* does not exist

---

[2] Further, Baumgartner's testimony about the wiretap approval process was cursory, less detailed, and less problematic than that which we found improper in *Cunningham*. *See* 462 F.3d at 710-11. Although this distinction is not our basis for finding the testimony permissible, it supports our conclusion that the district court did not abuse its discretion.

here, and the district court did not abuse its discretion by permitting Special Agent Baumgartner's testimony.[3] Despite the propriety of the district court's decision in this case, we note that the government stated during oral argument that after *Cunningham*, it is no longer the DOJ's practice to elicit such wiretap testimony.

###    D. *The District Court's Limitation on Navar's Cross-Examination*

Next, Navar alleges that the trial court erred by restricting his counsel's cross-examination of Jesus Herrera. After Herrera acknowledged that he was testifying pursuant to a plea agreement, Navar's counsel introduced the plea agreement into evidence and questioned Herrera extensively about the effect it could have on his sentence. Herrera conceded that he could obtain a reduced sentence if he was truthful. Not yet satisfied, Navar's trial counsel then attempted to question Herrera about the Sentencing Guidelines, including who would determine whether his

---

[3] Further, the district court did not permit endless questioning on this topic. Rather, it considered Navar's objection and instructed the prosecutor to restrict the questioning to simply establishing the fact that government agents may not "willy-nilly tap phones." After Baumgartner testified that he presented his affidavit to a district judge, the district court asked whether the prosecutor "intend[ed] to belabor this further," and upon getting a negative response, stated "[t]here is no impropriety up to this point, but try to concisely end on this issue with this witness."

testimony was "truthful" and what that term means—the actual truth, or what the government wanted to hear. Navar now asserts that the court violated his right to confront Herrera by sustaining the government's objections to this line of questioning.

The Sixth Amendment guarantees a defendant an opportunity for effective cross-examination, but there is no guarantee of cross-examination " 'to whatever extent[] the defense might wish.' " *United States v. Jackson*, 540 F.3d 578, 591 (7th Cir. 2008) (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). A judge has broad discretion to place reasonable limits on cross-examination, based on concerns of, *inter alia*, confusion of the issues and relevance. *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994). Where a trial court's limitation on cross-examination directly implicates the "core values of the Confrontation Clause," we review the limitation *de novo*; otherwise, we review for abuse of discretion. *See United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006).

One such core value is the ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie. *See id.*; *see also Van Arsdall*, 475 U.S. at 678-79. However, once a trial court permits a defendant to expose a witness's motivation, "it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Nelson*, 39 F.3d at 708. The right to confrontation is not implicated where "limitations on cross-examination did not deny the defendants the opportunity to *establish* that the witnesses may have had a motive to lie; rather, the limitations denied

them the opportunity to *add extra detail* to that motive." *Id.* That is precisely the case here. Because the district court did not prevent Navar's counsel from establishing Herrera's motivation for testifying, the court's limitation did not implicate the Sixth Amendment right to confrontation, and we review for abuse of discretion.

To determine whether the district court abused its discretion by limiting Navar's cross-examination, we must determine whether "the jury had sufficient information to make a discriminating appraisal of the witness's motives and biases." *United States v. De Gudino*, 722 F.2d 1351, 1355 (7th Cir. 1983). The jury in this case heard Herrera explain that he was testifying pursuant to a plea agreement, and that in exchange for his truthful testimony, the government would advocate for a lower sentence. The trial court permitted Navar's counsel to question Herrera about his awareness of the Sentencing Guidelines and even allowed Herrera to testify that he was facing a potential sentence of 235 to 297 months in prison when he entered the plea. *Cf. Nelson*, 39 F.3d at 708-09 (upholding district court's *refusal* to allow cross-examination of two government witnesses regarding the potential penalties they faced without their plea bargains). Only when Navar's counsel asked Herrera to speculate about what constituted "truthful" testimony or who made such a determination did the district judge limit the examination. The judge stated that the questions were confusing to the jury and were improper questions of law beyond the witness's knowledge, both of which are permissible grounds for limiting cross-examination. The jury had more than enough information to appraise

Herrera's motive to lie, and the district court did not abuse its discretion.

### E.  Ineffective Assistance of Counsel

Last, Navar asserts that he received ineffective assistance of counsel, based in large part on the way Navar's trial counsel handled the issues that we have already addressed. Such a claim is a mixed question of law and fact that we review *de novo*, with a strong presumption that the attorney performed effectively. *Bednarski v. United States*, 481 F.3d 530, 535 (7th Cir. 2007); *United States v. Fudge*, 325 F.3d 910, 923 (7th Cir. 2003).

The Sixth Amendment affords a criminal defendant the right to counsel, U.S. Const. amend. VI, and inherent in this right is that the defendant is entitled to the effective assistance of counsel, *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). But "effective" does not mean successful or without flaw. The important inquiry is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To prevail on a claim for ineffective assistance of counsel, Navar must establish (1) that his attorney's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687-88; *Fudge*, 325 F.3d at 923-24. Under the performance prong,

we must determine if Navar's counsel acted "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, and we "maintain a strong presumption that the defendant received effective assistance," *Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003). It is not our role to second-guess counsel's strategic decisions or "take up the role of the 'Monday morning quarterback.'" *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990). Under the prejudice prong, a "reasonable probability" that the result would have been different is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Navar faces the added difficulty of pursuing his ineffective assistance claim on direct appeal. We typically do not review an ineffective assistance of counsel claim on direct review, *United States v. Best*, 426 F.3d 937, 944 (7th Cir. 2005), but if we do, the defendant must rely on the trial record alone, because he lacks the ability to develop a factual record regarding the attorney's trial conduct, *see United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991). Without record of an attorney's motives, "every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." *Id.* at 417-18; *see also United States v. Johnson-Wilder*, 29 F.3d 1100, 1104 (7th Cir. 1994) ("[T]ypically the trial record will be silent about the *reasons* for actions taken by trial counsel."). Navar chose to brief and argue his ineffective assistance claim in this appeal, and we believe the proper outcome is clear from this record. Thus, we will address his claim.

Navar alleges that his counsel provided ineffective assistance in three ways: (1) by his confident statements regarding the burden of proof during his opening statement; (2) by failing to request that the district court instruct the jury concerning Herrera's and Tmiri's plea agreements at the time of their testimony; and (3) by failing to request a jury instruction for Special Agent Tulshi's voice identification similar to those provided for an eyewitness identification. We analyze each of these alleged errors separately and find that none of them deprived Navar of his Sixth Amendment rights.

### 1. Counsel's Comments Regarding the Burden of Proof

As outlined above, *supra* pt. II.A., Navar's counsel made a number of confident statements regarding the government's burden of proof, which Navar now argues so tarnished the proceedings that his assistance was ineffective. We have already determined that defense counsel's statements did not shift the burden of proof in violation of Navar's right to due process. For similar reasons, Navar's counsel was not ineffective by making the statements, and Navar fails to satisfy either prong of the *Strickland* analysis. Making the statements in question was a tactical decision designed to persuade the jury of the strength of Navar's case. The district court, the prosecutor, Thomas's attorney, and Navar's counsel himself each stated the proper burden of proof at various times throughout the trial. Nothing indicates that Navar's counsel seriously intended to give up the benefit of the government's burden of proof (nor could he), nor that the jury was confused on the issue.

While the statements appear overconfident in light of the evidence implicating Navar, they were not objectively unreasonable, nor is there a probable likelihood that the outcome would have differed without the statements.

### 2. *Failure to Request an Instruction Regarding Plea Agreements of Cooperating Witnesses*

Both Herrera and Tmiri testified against Navar pursuant to a plea agreement with the government. At the close of evidence, the district court instructed the jury using the Seventh Circuit's Pattern Instruction 3.13, entitled "Witnesses Requiring Special Caution," which specifically warned the jury that Herrera and Tmiri received the recommendation of a reduced sentence, that they were involved in the conspiracy for which Navar is on trial, and that they both pleaded guilty for that offense. Despite the fact that the district court delivered this limiting instruction, Navar asserts that his trial counsel should have requested a similar instruction contemporaneously with the witnesses' testimony.

First, defense counsel's assistance was not objectively unreasonable. Navar's counsel may have wished to avoid emphasizing that Herrera and Tmiri were members of a large criminal drug conspiracy, where both witnesses were implicating his client as a higher-ranking member of the same organization. We can only speculate about his motivations, but we must presume they were strategic unless persuaded otherwise, and we are not.

Second, Navar also fails to show prejudice. The district court properly instructed the jury at the end of trial, which

we presume, without more, the jury understood and considered and was effective for its limiting purpose. Further, Navar's counsel extensively cross-examined each witness regarding his plea agreement and the benefits each received, thereby explaining their bias to the jury. Counsel was not ineffective under *Strickland*.

### 3. Failure to Submit a Voice Identification Instruction

As a third basis for his ineffective assistance claim, Navar argues that his counsel acted unreasonably by failing to request a contemporaneous limiting instruction regarding Special Agent Tulshi's voice identification. Noting that a trial court should instruct a jury when a witness makes a visual identification, Navar claims that a voice identification should be similarly treated and cites *United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972).

To be entitled to an instruction on a defense theory, Navar must demonstrate that (1) the proposed instruction correctly stated the law; (2) the theory advanced by the instruction was supported by the evidence; (3) the theory advanced was not part of the charge presented to the jury; and (4) the failure to include the instruction on the defendant's theory denied the defendant a fair trial. *Magana*, 118 F.3d at 1208.

Navar's argument is short, undeveloped, and incorrect. We have already upheld the reliability of Tulshi's voice identification, and Federal Rule of Evidence 901(b)(5) states that a witness may identify a voice after hearing it at any time, under circumstances connecting it with the speaker.

The admissibility of a visual identification, however, is based on "[w]hether the witness had an adequate opportunity to observe the offender *at the time of the offense*." *Telfaire*, 469 F.2d at 558 (emphasis added) (appending a model special instruction on identification). The two types of identification are distinct and treated differently. *See Magana*, 118 F.3d at 1208-09 (holding that a proposed instruction would erroneously instruct the jury where it stated that the reliability of a witness's voice identification depends on the ability to hear the defendant's voice at the time of the offense). Therefore, even if Navar's counsel had proposed the desired instruction, the district court would have properly rejected it, as it is an incorrect statement of law. Further, Navar has pointed to nothing about the desired instruction, if given, that would have altered the trial's outcome. Therefore, he has failed to establish prejudice resulting from his counsel's decision not to request the instruction.

## III. GERARDO RECENDIZ—COUNSEL'S MOTION FOR WITHDRAWAL

Finally, we address an *Anders* brief submitted by counsel for a co-defendant, Gerardo Recendiz. Recendiz was charged with participating in the same conspiracy to possess with the intent to deliver in excess of five kilograms of cocaine, as well as conspiracy to conduct financial transactions with the proceeds of unlawful activity in violation of 18 U.S.C. § 1956(h). Recendiz pleaded guilty on July 12, 2005, and on March 6, 2006, after applying two downward adjustments, the trial court

sentenced him to 135 months in federal prison, the bottom of the range according to the Sentencing Guidelines. He filed a timely notice of appeal on March 14, 2006.

Recendiz's attorney filed an *Anders* brief in support of his June 7, 2007, motion to withdraw as Recendiz's appointed appellate counsel. *See Anders v. California*, 386 U.S. 738 (1967). Recendiz did not file a response. We have reviewed counsel's *Anders* brief and agree that there are no non-frivolous issues for appeal. The district court properly accepted Recendiz's guilty plea, and Recendiz indicated that he did not wish to challenge his plea. The district court also properly calculated and considered the applicable Sentencing Guidelines range, did not clearly err in its factual findings, and imposed a reasonable sentence at the bottom of the range after considering the factors articulated in 18 U.S.C. § 3553(a). We therefore grant counsel's motion to withdraw and dismiss Recendiz's appeal.

## IV. CONCLUSION

For the above reasons, we reject each of Navar's challenges. Marco Thomas adopted only Navar's argument regarding the opening statement, which fails for the same reasons. We therefore AFFIRM both defendants' convictions.

We agree with Recendiz's counsel that no non-frivolous issues exist for appeal, and we therefore GRANT his motion to withdraw and DISMISS Recendiz's appeal.