In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 16-3960

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PHIL LAMONT TRENT,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:15-cr-40026-001 — **Sara Darrow**, *Judge.*

———————————

ARGUED MAY 19, 2017 — DECIDED JULY 13, 2017

———————————

Before WOOD, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Defendant-Appellant Phil Trent distributed heroin that killed Tyler Corzette. He was charged in a five-count indictment, which included two counts related to Corzette's death.

At trial, Trent objected to testimony of two of the government's witnesses: Kyle Hull and Curtis Land. Like Trent,

these witnesses had also been charged with distribution of heroin resulting in Corzette's death, but each pled guilty to that charge pursuant to a plea agreement.

Trent sought to impeach Hull and Land based on their plea agreements. Specifically, he wanted to question them about the twenty-year mandatory minimum associated with the heroin-distribution-resulting-in-death charges. But because Trent had also been charged with distribution resulting in Corzette's death, he faced the same twenty-year mandatory minimum if convicted.

The district court noted that, if the jury became aware of the exact length of Hull's and Land's mandatory minimum, it would also know the minimum penalty that Trent would have to serve—which could improperly sway the jury's decision in Trent's case. To avoid this situation, the court prevented Trent from asking Hull and Land about the mandatory minimum's exact length but permitted him to describe the mandatory minimum as "substantial."

Trent now argues that this limitation violated his Sixth Amendment right to confrontation and was an abuse of discretion. We disagree and hold that the court committed no error in its ruling.

Trent also objected to the testimony of Illinois State Police Sergeant James Rieck, a government witness who had investigated Trent while undercover. During that investigation, Sergeant Rieck had communicated with Trent in person and by telephone. At trial, Sergeant Rieck identified Trent's voice in the phone calls. Trent objected to this identification, claiming that the government had not laid the necessary foundation. He asserts that argument again on appeal. We disagree

and hold that the court also did not err in allowing that testimony.

## I. Background

Trent was a heroin supplier in Rock Island, Illinois. Hull was a heroin addict who often purchased heroin from Trent and his dealers. On August 29, 2014, Hull planned to attend a local music festival with one of his friends, Corzette, who was also a heroin addict. The two decided to purchase heroin before they went to the festival. Hull called Trent and ordered three "bags" of heroin (each of which contained a tenth of a gram), one bag for Corzette and two bags for another friend, Jacob Thompson. Hull did not order any heroin for himself because he was already high from using heroin earlier that day—heroin that he had also purchased from Trent. Trent set the price at $90 for the three bags and told Hull to contact Land, one of Trent's dealers.

Hull then called Land, and they arranged a meeting. Hull, Corzette, and Thompson rode together to that meeting, and once they arrived, Hull purchased the bags of heroin from Land for the agreed-upon price. After the deal, Thompson took his two bags of heroin and went home.

Hull and Corzette then went to a nearby park where Hull helped Corzette cook and inject the heroin. Soon thereafter, Corzette passed out. Hull, who later testified that he was not initially worried about Corzette because he had seen this happen before with heroin use, left Corzette in the car and attended the music festival.

After the festival, Hull returned to the car and found Corzette still unconscious and with vomit on his clothes. Hull checked Corzette's pulse and, still believing him to be

fine, left Corzette in the car for the night. When Hull returned the following morning, he found Corzette dead in the car.

Hull panicked. He took the syringe from Corzette's hand and threw it in the grass next to the car. He then went to work. But after spending only an hour at work, Hull returned to the park and called the police. Rock Island Police Officer Christopher Sloan responded to the call. When he arrived, he spoke with Hull, who claimed that Corzette was dead. Officer Sloan called an ambulance and confirmed that Corzette was in fact dead. He then discovered the syringe that Hull had thrown in the grass. A forensic pathologist later concluded that Corzette had died of adverse effects from heroin.

*A. Investigation and Arrest of Trent*

Later on August 30, Hull agreed to cooperate with the police department in its investigation. In particular, Hull agreed to participate in a controlled purchase of three additional bags of heroin from Land that same day. This controlled purchase led to Land's arrest, after which Land also agreed to cooperate. The police department then arranged for an undercover officer to make two purchases of heroin from Trent. After the second purchase, the police department obtained an arrest warrant for Trent, and Trent was arrested on October 3, 2014.

The Rock Island Police Department later learned that the Illinois State Police had also been engaged in an undercover investigation of Trent in August of 2014. During that investigation, Sergeant Rieck communicated with Trent both in person and by telephone. He also purchased $50 of heroin

from one of Trent's dealers. Sergeant Rieck attempted to arrange a second purchase of heroin from Trent, but Trent refused after discovering that Rieck was an undercover officer.

*B. Trent's Jury Trial*

A grand jury returned a five-count indictment, charging Trent with one count of heroin distribution resulting in death, three counts of heroin distribution, and one count of conspiracy to distribute and possess with intent to distribute heroin resulting in death. These charges stemmed from both the Rock Island Police Department's investigation and the Illinois State Police's investigation of Trent. During a five-day jury trial, the government called numerous witnesses, including Hull, Land, and Sergeant Rieck.

*1. Testimony and Impeachment of Hull and Land*

Hull and Land testified about their interactions with Trent on and before August 29, 2014—the day that Corzette took the drugs that ultimately killed him. Hull said that he had been a heroin user since the summer of 2013 and that Trent was his regular heroin supplier. He further stated that he had used heroin with Corzette on several occasions before August 29. Hull then claimed that he called Trent to purchase heroin on August 29 and that Trent told him to arrange a meeting with Land. Next, Hull testified that, when he met with Land, he saw "what [he] thought was [Trent's] vehicle." (Tr. 203.) He then recounted his purchase of three bags of heroin from Land and his subsequent trip to the park to help Corzette inject heroin from one of those bags. Hull finally testified about his actions (or, perhaps more appropriately, his inaction) after Corzette began suffering from an apparent overdose.

Land testified that he had been a heroin user for over twenty years and that he had used heroin with Trent on several occasions since the summer of 2014. He then stated that he began selling heroin for Trent shortly after they met. He described their relationship in detail, stating that he would take six or seven bags of heroin from Trent each day, that Trent would set the price for that heroin, and that Land would sell those bags to Trent's customers. Land also claimed that he would return to Trent any heroin that he did not sell on any particular day.

Land then corroborated Hull's story about the August 29 drug sale. Specifically, Land testified that Trent dropped him off at a local gas station that afternoon and that he received calls from "a number of customers," including Hull. (Tr. 286.) According to Land, he met with Hull at the gas station and sold Hull the drugs that eventually killed Corzette. Land reiterated that the drugs he sold to Hull came from Trent. Land then testified that Trent "came and got the money" after the sale. (Tr. 288.)

Next, both Hull and Land—who were also arrested and charged with distribution of heroin resulting in Corzette's death—testified about their cooperation with the government. They stated that, in exchange for their cooperation, their truthful testimony at Trent's trial, and their pleas of guilty to a charge of distribution resulting in death, the government had agreed to file motions to reduce their sentences.

During the trial, Trent's defense counsel sought to impeach Hull and Land based on the details of their plea agreements. In particular, he wanted to question them about the *exact* mandatory minimum—twenty years—that they faced if they refused to cooperate and about how their coop-

eration could lead to a reduction of their sentences below that mandatory minimum.

The government sought to limit this impeachment to a more general questioning: although it agreed that Trent's counsel should be permitted to question Hull and Land about their cooperation and about their plea agreements, the government argued that Trent's counsel should be limited to discussing a *substantial* mandatory minimum rather than the exact length in years of that mandatory minimum.

Because Trent had been charged with the same crime to which Hull and Land had pled guilty—distribution resulting in death—he faced the same twenty-year mandatory minimum. The government thus sought to limit Trent's counsel's impeachment of Hull and Land to prevent the jury from learning the exact minimum penalty that Trent faced if convicted on the distribution-resulting-in-death charge.

The district court ruled in favor of the government and permitted Trent's counsel to question Hull and Land about the "substantial mandatory minimum" each faced "without quantifying the exact amount." (Tr. 235.) On cross-examination, Trent's counsel did just that: he impeached Hull and Land by asking a variety of questions about the mandatory minimum without referring to its twenty-year term.

### 2. *Testimony of Sergeant Rieck*

Sergeant Rieck testified about his involvement in the Illinois State Police's undercover investigation of Trent. He stated that he first met Trent in person on August 12, 2014 at a meeting arranged by a confidential informant. At that meeting, Sergeant Rieck spoke with Trent, seeking to buy $50 of

heroin. According to Sergeant Rieck, Trent answered that he could not sell heroin at that time but that he could arrange for a sale in the near future. Sergeant Rieck then testified that he spoke with Trent on the phone two more times. During those conversations, Trent instructed Sergeant Rieck to meet one of his dealers to complete the sale. On August 13, Sergeant Rieck followed Trent's instruction and purchased $50 of heroin from one of Trent's dealers.

Several times during Sergeant Rieck's testimony, Trent's counsel objected that the government had failed to lay a proper foundation for Sergeant Rieck's identification of Trent as the speaker on the phone calls. The district court initially sustained that objection and asked the government to lay a foundation. The government complied, asking Sergeant Rieck, "From the conversation you had with the defendant—this person here in the courtroom—in person and when you had this conversation over the phone, did you think it was the same person?" (Tr. 60.) Sergeant Rieck answered affirmatively. Trent's counsel continued to object that this foundation was insufficient, but the district court overruled his objections.

* * *

At the end of the five-day trial, a jury convicted Trent on all five charges. The district court sentenced Trent to an aggregate term of 300 months' imprisonment. This appeal followed.

## II. ANALYSIS

On appeal, Trent repeats two arguments that he made at trial. First, he contends that the district court abused its discretion and violated his Sixth Amendment right to confron-

tation when it refused to permit him to question Hull and Land about the specific length of the mandatory minimum each faced after pleading guilty. Next, Trent argues that the district court abused its discretion when it overruled his objections to Sergeant Rieck's testimony about his phone conversations with Trent. We address each argument in turn.

*A. Limitation on Cross-Examination*

Trent first argues that the court should have permitted him to cross-examine Hull and Land about the exact length—twenty years—of the mandatory minimum each faced on a distribution-resulting-in-death charge. Our standard of review when a district court limits the defendant's cross-examination depends on whether the court's limit "directly implicates the 'core values of the Confrontation Clause.'" *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) (quoting *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006)). If so, we review the limit *de novo*. If not, we review the limit only for abuse of discretion. *Id.*

The Sixth Amendment "guarantees a defendant an opportunity for effective cross-examination." *Id.* But that doesn't mean that the Sixth Amendment requires a district court to permit a defendant to question witnesses "in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Instead, a district court has discretion to place reasonable limits on cross-examination, especially when necessary to prevent irrelevant or confusing evidence from being presented to the jury. *Recendiz*, 557 F.3d at 530; *see also United States v. Cavender*, 228 F.3d 792, 798 (7th Cir. 2000) ("The district court retains wide latitude to impose reasonable limits on the scope and extent of cross-examination based on concerns about things like

harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant.")

Federal juries don't sentence defendants in noncapital cases. *Cf.* 18 U.S.C. § 3593 (discussing juries' role in capital sentencing). We have thus permitted district courts to prevent juries from learning information from which they could infer defendants' potential sentences, holding that inclusion of this information might confuse or mislead the juries in their true task: deciding defendants' guilt or innocence. *See United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002), *superseded by statute on other grounds as stated in United States v. Benabe*, 654 F.3d 753, 781 (7th Cir. 2011). That is precisely what the district court did here: it limited Trent's cross-examination of Hull and Land to prevent the jury from learning the exact penalty that Trent himself faced on conviction.

Nonetheless, Trent contends that the term "substantial"—as the district court permitted Trent to describe the mandatory minimum in lieu of using the exact term of years—was too "nebulous" to give the jury a full impression of the witnesses' incentives to testify. (Appellant's Br. at 20.) He asserts that, had the *precise* "magnitude" of Hull's and Land's potential sentences been made known to the jury, "the jury might have received a substantially different impression of their credibility." (*Id.*) Because the district court did not permit Trent to question Hull and Land about the exact length of the mandatory minimum, Trent maintains that his Sixth Amendment rights were violated.

True enough, the "ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie" is a core value of the Sixth Amendment's Confrontation Clause.

*Recendiz*, 557 F.3d at 530. But that value is only offended when "the defense is completely forbidden from exposing the witness's bias." *United States v. Sanders*, 708 F.3d 976, 990 (7th Cir. 2013) (quoting *United States v. Manske*, 186 F.3d 770, 778 (7th Cir. 1999)). When the defense is given a reasonable opportunity to question witnesses about their biases, the Sixth Amendment is not implicated. "In other words, merely having the chance to present a motive to lie is sufficient to satisfy the core values of the confrontation right." *Id.* at 991.

Here, Trent was not prohibited from cross-examining Hull and Land about their potential biases or motives to lie. Rather, the district court permitted Trent to vigorously cross-examine them. For instance, Trent's counsel asked Hull the following questions:

- And you have a rather substantial mandatory minimum sentence, don't you?
- And it's a pretty long time, isn't it?
- You know that the judge who decides—who sentences you cannot give you a sentence below that substantial mandatory minimum unless the prosecutors file a motion and ask the judge to go below that mandatory minimum?
- So, you certainly want one of [the two prosecutors] to be happy with your testimony so they'll file that motion [reducing your sentence], don't you?
- And that's why you're here, is to get your sentence reduced, isn't it?
- That's why you entered into the plea agreement, so you'd get an opportunity to

> get your sentence reduced below the man-
> datory minimum, correct?
>
> • Because you don't want to serve that much
>   time in prison if you can avoid it, correct?

Trent's counsel similarly asked Land the following ques-
tions:

> • Now, because of the charge that you pled
>   guilty to, you are facing a substantial man-
>   datory minimum sentence; is that fair? Is
>   that correct?
>
> • And you don't really want to serve that
>   much time, do you?
>
> • And the only way you can get less than that
>   substantial mandatory minimum sentence
>   is if one of [the two prosecutors] right here
>   files a motion to ask the judge to reduce
>   your sentence below that mandatory mini-
>   mum; is that correct?
>
> • And you know that it's by you cooperating
>   with this plea agreement that you signed
>   with the government that you can get your
>   sentence reduced if they believe that your
>   testimony was helpful?
>
> • And you want them to believe that [your
>   testimony was helpful]?
>
> • Because you told us nobody would want to
>   serve that mandatory minimum, right?

In response to the questioning, Hull and Land admitted
that they were testifying under plea agreements and that the
government agreed to file motions to reduce their sentences
if they agreed to testify truthfully. They also admitted that,
without the government's motion, they would have to serve

the duration of the substantial mandatory minimum. (Tr. 268–69; Tr. 319–22.)

Because the court allowed Trent to engage in this thorough cross-examination, which readily exposed any of Hull's or Land's biases and incentives to testify adversely to Trent, the court did not offend the core values of the Confrontation Clause. *See Recendiz*, 557 F.3d at 530–31; *Sanders*, 708 F.3d at 990–91. We therefore review the district court's limitation only for abuse of discretion. *Recendiz*, 557 F.3d at 530.

To determine whether the court abused its discretion, we must decide "whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and biases." *Sanders*, 708 F.3d at 991 (quoting *Recendiz*, 557 F.3d at 530). Trent contends that the jury couldn't make a "discriminating appraisal" without knowing the mandatory minimum's exact length. We disagree.

Based on the answers to Trent's extensive cross-examination of both Hull and Land, we hold that the jury had ample information to make a discriminating appraisal of the motives of those two witnesses.

Trent's argument that the court's limitation precluded him from portraying the full magnitude of Hull's and Land's biases is unavailing. Although the court did not permit Trent to mention the mandatory minimum's twenty-year term, it did allow him to describe the term as "substantial." And Trent probed in painstaking detail each witness's incentives to lie.

Hull admitted to the jury that the mandatory minimum was a "pretty long time" (Tr. 268), and Land averred that "nobody would" want to serve the entire length of the man-

datory minimum (Tr. 319). Moreover, the court instructed the jury to consider the overall testimony of Hull and Land "with caution and great care." (Tr. 617.)

Although "[t]he jury might not have possessed all the information [Trent] wanted it to have, … it certainly had sufficient information to evaluate [Hull's and Land's] testimony." *Sanders*, 708 F.3d at 991. Given the court's very real and well-founded concerns about misleading or confusing the jury, we hold that the court did not err, let alone abuse its discretion, by limiting Trent's cross-examination of Hull and Land in the manner that it did.

### B. *Foundation for Voice Identification*

Trent next argues that the district court erred by permitting Sergeant Rieck to identify Trent's voice in phone conversations. In so arguing, he contends that the government failed to lay the necessary foundation for that testimony. We review a district court's evidentiary rulings, including those pertaining to foundation, for abuse of discretion. *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016).

Rule 901(a) of the Federal Rules of Evidence discusses the authentication or identification of evidence: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides specific examples of "evidence that satisfies" Rule 901(a). One of those examples—Rule 901(b)(5)—provides that a voice identification can be established by "[a]n opinion identifying a person's voice— whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at

any time under circumstances that connect it with the alleged speaker." "We have consistently interpreted this rule to require that the witness [identifying a voice] have only 'minimal familiarity' with the voice." *United States v. Cruz-Rea*, 626 F.3d 929, 934 (7th Cir. 2010) (quoting *United States v. Neighbors*, 590 F.3d 485, 493 (7th Cir. 2009)).

Minimal familiarity is not a high bar. *United States v. Collins*, 715 F.3d 1032, 1036 (7th Cir. 2013); *see also United States v. Mendiola*, 707 F.3d 735, 739–40 (7th Cir. 2013) (collecting cases). For instance, we have held that hearing a voice only once during a court proceeding is sufficient. *United States v. Mansoori*, 304 F.3d 635, 665 (7th Cir. 2002). We have likewise concluded that a witness who had heard a voice in a recorded phone conversation could later identify that voice as the defendant's after speaking with the defendant during his arrest and post-arrest interview. *Recendiz*, 557 F.3d at 527.

Here, Sergeant Rieck testified that he had met with Trent in person prior to speaking with him on the phone. At that meeting, Trent and Sergeant Rieck discussed a possible heroin transaction. This in-person meeting provided Sergeant Rieck with the necessary minimal familiarity with Trent's voice such that he could later identify it on the phone calls. The government laid the necessary foundation for Sergeant Rieck's identification of Trent's voice by asking Sergeant Rieck if he believed that the person with whom he had dealt in person was the same person with whom he had spoken on the phone. Sergeant Rieck answered that question affirmatively.

Furthermore, the government offered significant corroborating evidence supporting Sergeant Rieck's identification. This evidence included (1) Trent's phone, which showed that

Trent had saved Sergeant Rieck's phone number in his contact list; (2) Trent's phone records, which showed that Trent and Sergeant Rieck had contacted one another on August 13, the day of the undercover drug purchase; and (3) Trent's phone number, which was the number Sergeant Rieck, Hull, and Land had used to contact Trent. In light of this substantial circumstantial evidence and Sergeant Rieck's voice identification of Trent, we conclude that the district court did not abuse its discretion by overruling Trent's objections and permitting Sergeant Rieck's testimony.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment of conviction.