In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 18-2013 & 18-2044

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OTIS HUNTER and
DESHAWN EVANS,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
Nos. 17-CR-29-2 and 17-CR-29-4 — **J.P. Stadtmueller**, *Judge.*

_____

ARGUED APRIL 5, 2019 — DECIDED AUGUST 5, 2019

_____

Before FLAUM, KANNE, and SCUDDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Police arrested five men involved in a string of Milwaukee armed robberies in late 2016. Three of the defendants cooperated with the government and pled guilty. The two remaining defendants, Otis Hunter and Deshawn Evans, proceeded to trial where a jury convicted them. Through counsel, the pair challenges the district court's handling of jury selection and denial of their *Batson* challenge.

They also challenge our circuit precedent and argue that the district court violated the Sixth Amendment's Confrontation Clause when it prevented them from cross-examining government witnesses about the specific prison terms they avoided through their cooperation. After obtaining authorization from the court, Hunter made additional, *pro se* arguments challenging how the trial court handled witness testimony and whether the government provided sufficient evidence to support his conviction. All challenges are rejected and we affirm.

## I. BACKGROUND

Authorities arrested five men in connection with a series of crimes in late 2016: Dominique Rollins, Otis Hunter, Kelly Scott, Deshawn Evans, and Anthony Lindsey. Rollins, Scott, and Lindsey pled guilty and testified for the government, but Hunter and Evans proceeded to trial.

The government connected the defendants to the following crimes. First, on November 17, 2016, Hunter, Rollins, and Scott committed an armed robbery of a Roman's Food Market. They held up an employee, made him open the cash register, struck him on the head with a pistol, and then took the money and a large quantity of Newport cigarettes. Surveillance footage captured the robbery. Rollins and Scott testified at trial that they robbed the store with Hunter. They also narrated the surveillance footage and identified Hunter and his pistol. At the time of the robberies, Doris Brown—Lindsey's mother and Scott's fiancée—lived at a house on 15th Place where the defendants regularly congregated. She later testified that she saw Hunter with many packs of Newport cigarettes. She also viewed the surveillance footage and identified the robbers.

Three days later, on November 20, two men committed an armed carjacking of a food delivery driver outside of Aurora Sinai Hospital. The robbers struck the driver on the head with a pistol, took his phone, car keys, and wallet, and fled in his black Cadillac CTS. Surveillance footage captured the robbery. Scott and Lindsey viewed the footage at trial and identified the pair as Hunter and Evans.

Then on November 22, three men with stocking-covered faces robbed a George Webb restaurant. Two of the robbers brandished pistols. They took $70 in cash and some receipts from the register and held up employees. The three fled the scene in a black Cadillac. As before, surveillance footage captured the robbery. Scott and Lindsey confessed to robbing the restaurant with Hunter and identified Hunter and Scott at trial as the pair who brandished firearms.

A day after the George Webb robbery, on November 23, police found the black Cadillac CTS parked near the home on 15th Place where the defendants met. Inside the car, they found receipts from the George Webb restaurant and a nylon stocking. DNA recovered from the stocking linked it to defendant Anthony Lindsey.

On November 25, two men attempted to rob a Walgreens pharmacy at gunpoint. One of the two men brandished a pistol and pointed it at the cashier. When the cashier failed to open the register, the robber struck him on the head with the pistol, knocking him to the ground. The robbers also failed to open the register. They instead attempted to rob the customers as a consolation but recovered no valuables. Surveillance footage captured the attempted robbery. Lindsey, Scott, and Doris Brown viewed the footage at trial and identified the rob-

bers as defendants Hunter and Evans, with Evans brandishing the firearm and striking the cashier. Brown also testified that she overheard Hunter discussing the Walgreen's robbery at her house.

On December 4, two men carjacked the owner of a Ford Focus. They cornered the victim against the side of the car, one pressed a firearm into the victim's stomach, and they robbed him, taking his credit cards, phone, and wallet before making their escape in his vehicle. About 30 minutes after the carjacking, the robbers used the victim's credit cards at a Foot Locker store. The Foot Locker's surveillance footage from the time of the purchase showed Hunter there, accompanied by a minor. The victim identified the pair as the carjackers through photographs and later identified Hunter in court as the carjacker who pressed the pistol into his stomach. Brown, Scott, Lindsey, and Rollins each viewed the surveillance footage and identified Hunter.

On December 5, the stolen Ford Focus turned up parked behind the house on 15th Place. Police arrested Evans, the minor, and Anthony Lindsey in the car. Hunter—on-the-run—was arrested five days later in Ohio. Hunter's vehicle contained new Foot Locker merchandise and multiple Foot Locker receipts dated December 4, which reflected purchases made with the credit cards taken during the Ford Focus carjacking.

The grand jury returned an 11-count indictment against the five men. Relevant to this appeal, Hunter was charged with conspiracy (18 U.S.C. § 371), robbery of the Roman's Food Market under the Hobbs Act (18 U.S.C. § 1951), carjacking the Cadillac (18 U.S.C. § 2119), robbery of the George Webb restaurant under the Hobbs Act, attempted robbery of

the Walgreens under the Hobbs Act, and carjacking the Ford Focus. Hunter was also charged with brandishing a firearm during each of these crimes in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Evans faced charges for conspiracy, carjacking the Cadillac, and the attempted robbery at Walgreens. He was also charged with brandishing a firearm during these crimes.

Hunter and Evans—who are both African Americans—proceeded to a jury trial. As a preface to jury selection, the court questioned all potential jurors about their experiences testifying under oath in the judicial system and the courts. However, multiple jurors failed to disclose relevant information related to this line of questioning. During jury selection, the government struck several jurors for cause and used its peremptory strikes. The entire jury pool included just three potential African American jurors. The initial *voir dire* included only two. One of these two, Juror 12, was eventually empaneled.

The government questioned the other potential African American juror, Juror 7, about an allegedly racially-charged Facebook post on her profile. The government also learned that Juror 7's family had significant contacts with the criminal justice system and she personally had other abject experiences with the courts. Specifically, Juror 7's son has been adjudicated delinquent on multiple occasions, and her ex-husband was occasionally imprisoned following numerous convictions. During one of her ex-husband's arrests, authorities seized her firearm, which she later petitioned a court to recover. Juror 7 had also been through multiple eviction proceedings, a bankruptcy, and received adverse judgments for failing to pay utility bills. Altogether, during the first round

of *voir dire* questioning, Juror 7 never disclosed a number of her contacts with the courts and criminal justice system.

The government moved to exclude Juror 7 for cause, but the district court denied the motion. Before defense counsel even raised an objection, the district court specifically warned the government that if it moved to strike Juror 7, the court would conduct a *Batson* hearing. The government nevertheless used one of its peremptory strikes against Juror 7. Before the district court swore in the selected panel, the defendants raised a *Batson* challenge.

During the *Batson* hearing, the government explained that it struck Juror 7 due to her numerous abject engagements with law enforcement and the courts. In response, defense counsel laid out examples that it argued demonstrated the government's disparate treatment of similarly-situated white jurors. It pointed out that the government never attempted to strike three other jurors who also had similar judicial encounters. Moreover, the defense pointed out that Juror 35, a white male, had been recently charged with firearm-related offenses but found not guilty by reason of temporary insanity. Additionally, the defense suggested that the government's questions about Juror 7's Facebook posts demonstrated the impermissible, racial motivation for the strike. For its part, the government explained that it was not previously aware of Juror 35's identity or background and directed the court's attention to a list of potential jurors that the court gave to the parties a week earlier. That list did not include Juror 35. The court determined that it needed to investigate the matter. It ordered the parties to submit same-day briefing on the *Batson* challenge and adjourned for the day.

On the second day of trial, the district court determined that the clerk's office failed to include information about Juror 35 and several others in the materials it distributed to the parties.[1] The court allowed the parties to conduct supplemental *voir dire* for a few jurors, beginning with Juror 5, whom defense counsel identified during its *Batson* challenge as an example of the government's disparate treatment. On further questioning, despite initially claiming to have never been involved with the courts, Juror 5 admitted that he experienced a foreclosure and a bankruptcy years earlier but claimed he did not understand the court's earlier questions about previous court experience.

The parties then questioned Juror 35, a white man. The additional questions revealed that Juror 35 suffered from PTSD and was found not guilty by reason of a temporary mental deficiency to three counts related to an incident involving his discharging a firearm. Juror 35 also disclosed a divorce and a bankruptcy. The government then moved to strike Juror 35 for cause.

Next, the court allowed the government to conduct supplemental *voir dire* questioning of Juror 36, a white woman. The government's questioning revealed that Juror 36's brother had been convicted of a sexual assault of a minor more than 30 years earlier. She too had been through a divorce and a bankruptcy years earlier.

After the parties finished supplemental *voir dire* of Juror 36, the bailiff informed the court that Juror 35 was in the restroom, vomiting. The government renewed its motion to

---

[1] The record does not clearly identify the other affected jurors.

strike Juror 35 for cause, which the court granted over Hunter's counsel's objection.

To remedy the confusion regarding missing juror information, the district court then started jury selection over from the same venire. The district court asked all potential jurors, again, about their involvement with the court systems, giving explicit examples of different types of relevant proceedings where they might have been sworn and given testimony. Multiple jurors then acknowledged that they should have responded affirmatively to a similar question the day before. The parties selected a new panel and the government renewed its peremptory strike against Juror 7. However, this time it also used a peremptory strike on Juror 36.

The defense again objected under *Batson*, arguing that the government treated Juror 7 differently based on her race. The government explained that it struck all jurors who had negative experiences with the criminal justice system. The defense replied that the government used its strikes as a pretext for excluding Juror 7. The defense also complained that the court's process of going back and re-examining the other potential jurors enabled the government to make a *post-hoc* justification of its impermissible, race-based strike.

The district court concluded the defendants failed to establish that the government struck Juror 7 on account of her race. The court noted that, altogether, the government executed peremptory strikes on six jurors: five white jurors and Juror 7. Similarly, the court recognized that the government articulated a legitimate, race-neutral reason for striking Juror 7, and that the government struck other similarly-situated white jurors. The district court then swore in the jury, which included one African American juror, Juror 12.

As previously mentioned, three of the original defendants pled guilty and testified for the government. During their testimony, defense counsel sought to impeach these witnesses on the basis that they each benefitted from reduced sentences by virtue of their cooperation with the government. However, at the government's objection, the district court limited this cross-examination. Because each of the witnesses originally faced similar charges to Hunter and Evans, the government worried jurors might deduce the potential imprisonment terms that Hunter and Evans faced. The district court permitted cross-examination about the sentence reduction, but excluded questioning about the specific terms of their possible sentences.

The government also called Steven Strasser, an investigator at the Milwaukee County District Attorney's Office, to testify at trial. The government never identified Strasser as either an expert or a summary witness ahead of trial, but Strasser began his testimony drawing on his professional experiences and his general observations from reviewing hundreds of robberies. After Strasser began to draw comparisons between the surveillance videos from the different robberies to show consistent patterns, the defense objected. The court found that the government should have designated Strasser as a summary witness and, because it failed to do so, Strasser's testimony should be limited. The court also determined that the testimony was cumulative because the evidence the government expected him to testify to spoke for itself. The district court limited Strasser's testimony to issues of his own involvement in the case. Neither party asked for a curative instruction to the jury for the testimony that Strasser gave before the defendants' objection. The district court provided no curative or limiting instruction.

The jury convicted Hunter and Evans. The district court sentenced them to their mandatory minimum sentences plus one day: 107 years for Hunter and 32 years for Evans.

## II. ANALYSIS

On appeal, Hunter and Evans share two main arguments. First, the pair argues that the district court erred by rejecting their *Batson* challenge. Second, they argue that the district court improperly limited cross-examination of the government's cooperating witnesses about reductions in their potential sentences.

Despite receiving appointed counsel, Hunter also sought and received permission from the court to raise additional arguments, *pro se*. He objects, *pro se*, along three lines. First, he maintains that the district court should have excluded some witness testimony as hearsay or unduly prejudicial. Second, Hunter claims that the district court erred by failing to provide a curative instruction advising the jury to ignore a portion of Strasser's testimony. Lastly, Hunter believes that the government proffered insufficient evidence to prove the interstate-commerce elements on two of the business robberies and the *mens rea* elements of carjacking.

### A. The District Court Committed No Error By Rejecting the Batson Challenge

Hunter and Evans argue that the district court failed to conduct an adequate *Batson* inquiry and also improperly accepted the government's "implausible" race-neutral rationale for striking Juror 7. We review the district court's finding on a *Batson* challenge for clear error. *United States v. Carter*, 111 F.3d 509, 512 (7th Cir. 1997). "[T]o reverse we must have a firm and definite conviction that a mistake was made." *United*

*States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011) (quotation omitted). The Supreme Court has described our standard of review as "highly deferential." See *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019).

In *Batson*, the Supreme Court determined that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

There are three steps to a *Batson* challenge. First, the defendant makes a *prima facie* showing that the prosecution's peremptory strikes were discriminatory. *Id*. at 93-94. Second, the government must tender a nonracial reason for the use of its peremptory strike. *Id*. Lastly, the district court must decide whether the defendant established purposeful discrimination. *Id*. Where the prosecution has "offered a race-neutral explanation for the peremptory challenge, the test is compressed down to the ultimate question of intentional discrimination; the preliminary question of a *prima facie* case becomes moot." *Carter*, 111 F.3d at 512 n.1 (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991)).

Fundamentally, Hunter and Evans seem to believe that because the court restarted jury selection from the same panel, the government had time to come up with an ostensibly legitimate excuse for striking Juror 7. They charge that the government clearly demonstrated its impermissible racial motivation by failing to investigate and strike similarly-situated jurors. Consequently, they believe they met their *Batson* burden with the first panel, but the government was able to hide its discriminatory purpose by striking other potential jurors on

similar grounds in the second, "redo" panel. The "redo" panel, therefore, deprived them of a valid *Batson* challenge and prejudiced them.

Viewing the whole record, we believe the district court ultimately committed no clear error. But two arguments which Hunter and Evans make merit further discussion. First, the government did not ask all other potential jurors the same number of probing questions about relationships with the courts or the criminal justice system. However, it appears that many of those other jurors (like Juror 7) either failed to disclose all the details they should have or did not understand this line of questioning. The district court attempted to correct the jury issues on the "redo" panel by clarifying the question for the potential jurors. When the government learned of others' contacts with the courts, it struck those jurors, too.

Second, the government initially did not strike Juror 35, despite his recent and serious criminal charges. But the clerk's office failed to distribute an updated potential juror list to the parties, so the government had no opportunity to investigate and strike Juror 35, as it did other jurors. This error demonstrates that the government's different treatment of Juror 35 was motivated by ignorance, not race. The district court corrected the error when it afforded the parties an opportunity to conduct additional questioning.

The record reflects the district court's *Batson* concerns. The court advised the government that the parties would conduct a full *Batson* hearing if the government used a peremptory strike against Juror 7. The court also provided a long explanation to the parties as to why it denied the defendants' *Batson* challenge. The defendants urged that the court's "redo" al-

lowed the government to cure its pretextual excuse for striking Juror 7 by also striking similarly-situated white jurors. They argue that this effectively allowed the government to expand its facially race-neutral rationale, conflicting with *Taylor*. That case involved multiple remands from our court to the district court for further exploration of the government's proffered reason for striking an African American juror. However, when the district court conducted another *Batson* hearing to supplement the record on remand, "the government took the opportunity to expand on its rationale for striking [the juror], advancing seven new reasons[.]" *Taylor*, 636 F.3d at 904. We held that "[a]ccepting new, unrelated reasons extending well beyond the prosecutor's original justification for striking [a juror] amounts to clear error." *Id*. at 906.

Here, the district court never swore the jury, but instead started selection over after new information came to light. The government's justification for striking Juror 7 remained consistent throughout the whole process. In the wake of a clerical error, the court's *voir dire* process sought to reveal all necessary juror information to benefit the parties. To ensure a fair trial, the district court had the parties start over in selecting and striking jurors. The district court's restart process allowed the government to apply its rationale more evenly and fairly, but not to expand it. Even if we agree that the district court could have conducted a more perfect jury selection by starting over with a new panel, we do not believe the district court's "redo" in this case constituted clear error. The Supreme Court expressly declined to mandate a procedural approach for handling jury selection after a party raises a *Batson* challenge. *Batson*, 476 U.S. at 99 ("We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges."). *See also id.* at n.24

(noting the variety of jury selection processes employed in American courts). The district court provided a fair procedure for jury selection in this case. *United States v. Mannie*, 509 F.3d 851, 857 (7th Cir. 2007) ("It is axiomatic in our system of justice that an individual is entitled to a fair trial—not a perfect one.").

B. *The District Court Properly Limited Defense Counsel's Cross-Examination of Government Witnesses*

Hunter and Evans argue that the district court erred by preventing them from cross-examining the government's witnesses about the specific mandatory minimum sentences they avoided by cooperating with the government. They believe the district court's limitation violated the Sixth Amendment's Confrontation Clause.

"Our standard of review when a district court limits the defendant's cross-examination depends on whether the court's limit directly implicates the core values of the Confrontation Clause. If so, we review the limit *de novo*. If not, we review the limit only for abuse of discretion." *United States v. Trent*, 863 F.3d 699, 704 (7th Cir. 2017) (internal quotations omitted).

To advance their argument, Hunter and Evans directly challenge and invite us to overturn our opinion in *United States v. Trent*. We decline their invitation. In *Trent*, we held that limiting cross-examination of government witnesses about specific sentences and the sentencing guideline ranges they faced before and after their cooperation with the government did not violate a defendant's Sixth Amendment rights. 863 F.3d at 706. We explained that to satisfy the Confrontation Clause, it is enough that a defendant can elicit that witnesses

will receive a "substantial" reduction in imprisonment. *Id*. This limitation is sometimes necessary when criminal defendants and government witnesses face the same criminal charges. We explained that if the jury learned about the precise sentence terms that government witnesses faced, then it could deduce or infer the sentences facing the similarly-charged defendants. *Id*. Consequently, the reality of a serious sentence could prejudice the jury and cause it to acquit the defendants of crimes they actually committed. *Id*.

Hunter and Evans claim that *Trent* overstates the risk of prejudice from cross-examination about the mandatory minimum sentences. They argue *Trent* violates the Confrontation Clause and suggest that other circuits disagree with our analysis. To support this claim, Hunter and Evans cite cases from three other circuits. *See United States v. Chandler*, 326 F.3d 210 (3d Cir. 2003); *United States v. Cooks*, 52 F.3d 101 (5th Cir. 1995); *United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (*en banc*).

However, *Chandler* and *Cooks* are distinguishable in that neither the Third nor the Fifth Circuits adopted categorical approaches stating that defendants can cross-examine cooperating witnesses on the precise nature of their prison terms. In both cases, the courts determined that the analysis depends on whether the jury has sufficient information "to appraise the bias and motives of the witness." *Cooks*, 52 F.3d at 104; *United States v. Mussare*, 405 F.3d 161, 170 (3d Cir. 2005) ("In *Chandler*, we left unresolved the question of whether the Confrontation Clause entitles a defendant categorically to inquire into the concrete terms of a cooperating witness's agreement with the government, including the sentence that witness may have avoided through his cooperation.") (quotation omitted).

And the Ninth Circuit's *Larson* opinion hinges on the fact that the cooperating witness in that case faced a particularly severe sentence: life imprisonment. *Larson*, 495 F.3d at 1107 ("[A]ny reduction from a mandatory life sentence is of such a significant magnitude that excluding this information de-nie[s] the jury important information necessary to evaluate [the witness's] credibility."). We do not find the Ninth Circuit's analysis so persuasive as to abandon *Trent*. The Eighth Circuit explicitly rejected *Larson*'s approach. *See United States v. Wright*, 866 F.3d 899, 907 (8th Cir. 2017). And at any rate, none of the government's witnesses in this case faced a sentence of life imprisonment.

Here, the district court directly followed our guidance in *Trent*. The record shows that the defense cross-examined the government's witnesses on the fact that they benefitted from cooperating with the government. Specifically, defense counsel elicited from witnesses that, without cooperating, they would have, "never seen the light of day" and would have "died in prison." The defense's cross-examination exposed enough information for the jury to deduce that the witnesses received a serious benefit from cooperating with the government. *See Trent*, 863 F.3d at 706 ("Because the court allowed Trent to engage in this thorough cross-examination, which readily exposed any of [the witnesses'] biases and incentives to testify adversely to Trent, the court did not offend the core values of the Confrontation Clause."). As in *Trent*, the district court's limitation did not significantly impact Hunter and Evans' ability to cross-examine adverse witnesses.

### C. Hunter's Pro Se Arguments Do Not Prevail

Despite Hunter's representation by counsel, we also authorized him to present several arguments in an additional,

*pro se* brief. "Although there is no Sixth Amendment right to file a *pro se* brief when the appellant is represented by counsel, nothing precludes an appellate court from accepting the *pro se* brief and considering the arguments contained therein for whatever they may be worth." *Hayes v. Hawes*, 921 F.2d 100, 102 (7th Cir. 1990) (*per curiam*). Although sometimes authorized (as here), the filing of *pro se* briefs by a defendant who is represented by counsel is generally unhelpful. We consider Hunter's remaining, *pro se* arguments in turn.

### 1. The District Court Made Proper Evidentiary Rulings

Hunter, *pro se,* raises challenges to several evidentiary rulings made by the district court. "We review the admission of evidence for an abuse of discretion and 'will reverse an evidentiary ruling only when the record contains no evidence on which the district court rationally could have based its ruling.'" *United States v. Quiroz*, 874 F.3d 562, 569 (7th Cir. 2017) (quoting *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010)).

First, Hunter believes that the district court should have excluded Brown's testimony because she was a "biased" witness. Earlier we mentioned that Brown's son and fiancé were defendants in the case who pled guilty and agreed to testify against Hunter and Evans. To support this argument, Hunter cites *United States v. Abel*, 469 U.S. 45, 53 (1984). However, *Abel* established that evidence of membership in a prison gang could be introduced to impeach a witness because it was probative of witness bias, not that biased witness testimony could never be admitted. *Id*. Indeed, the Court in *Abel* specifically validated exposing witness bias as an acceptable means of impeachment under the Federal Rules of Evidence. *Id*. at 51. And Hunter's counsel exposed Brown's relationship to two of the

government's cooperating witnesses and her potential bias on cross-examination. We therefore find no error in allowing Brown's testimony.

Second, Hunter challenges another portion of Brown's trial testimony on hearsay grounds. At trial, Brown testified to overhearing Hunter discuss details of the Walgreen's robbery in her kitchen. Over defense counsel's objection, the district court agreed with the government that that the testimony fell into the hearsay exception for a statement by a party opponent. Fed. R. Evid. 801. We agree. The Rule provides that statements made by a party in an individual capacity that are later offered against him are not hearsay. Fed. R. Evid. 801(d)(2)(A). Hunter attempts to rely on *United States v. El-Mezain* for the proposition that "a witness's testimony must be based on personal knowledge." 664 F.3d 467, 495 (5th Cir. 2011). He claims that because Brown testified that she learned of the Walgreens robbery from the news, she did not base her testimony about his involvement in the robbery on personal knowledge. Hunter's argument misses the point. Brown's testimony centered on her personal knowledge of what she heard Hunter say, and those things are admissible as non-hearsay statements by a party opponent. *Jordan v. Binns*, 712 F.3d 1123, 1128–29 (7th Cir. 2013) ("There are only two requirements for admissibility under FRE 801(d)(2)(A): a statement was made by a party, and the statement was offered against that party.").

Hunter similarly objects to testimony given by Kelly Scott, one of the co-defendants who cooperated with the government. Like Brown, Hunter believes Scott was a biased witness, but this complaint fails for the same reason. Hunter and Evans made Scott's cooperation with the government an issue at

trial, suggesting that Scott's reward for cooperating—a reduced sentence—motivated him to fabricate his testimony against them. Attempting to rehabilitate Scott, the government asked him whether he had anything to fear by cooperating and testifying. Scott mentioned that someone had hit him over the head in jail. The district court overruled the defense's objection for relevance. Scott also testified that he overheard Hunter and Evans discussing the case and making threats against him in a holding area during the trial.

Hunter claims that the district court should have excluded this testimony as irrelevant and characterizes it as highly prejudicial to the jury. We previously have held that evidence of threats by a defendant against a prosecution witness on direct examination is inadmissible unless it is linked to a specific credibility issue at trial—like a witness's behavior on the stand or testimony that is inconsistent with prior statements. *See United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996); *United States v. Thompson*, 359 F.3d 470, 477 (7th Cir. 2004). Indeed, *Thomas* and *Thompson* each rejected efforts to use threats against a witness to generally "bolster" or "boost" a witness's credibility. However, we have also held that "[o]nce a witness's credibility has been attacked…the non-attacking party is permitted to admit evidence to 'rehabilitate' the witness." *United States v. Lindemann*, 85 F.3d 1232, 1242 (7th Cir. 1996). We have explained that the government may introduce testimony about a witness's motives on direct examination when such testimony is rehabilitative and likely to give the jury a full picture. *United States v. McKinney*, 954 F.2d 471, 479 (7th Cir. 1992).

Hunter's defense counsel aggressively challenged the integrity of the government's witnesses from the trial's start and

vigorously cross-examined them about their motivations to lie. With respect to Scott, defense counsel thoroughly walked through Scott's inconsistent statements, criminal history, and his belief that lying to the police is occasionally permissible. The threats occurred in the midst of and in response to Scott's decision to testify for the government, so they were relevant to his testimony and credibility. In this context, we cannot agree that the district court abused its discretion by allowing Scott to testify to the adverse consequences of his cooperation. *See id*. ("Whether the potential for unfair prejudice of a given piece of evidence outweighs its probative value is a decision left to the district court's discretion.").

Accordingly, we find no errors in the district court's evidentiary rulings.

Hunter also claims that Dominique Rollins gave "false testimony" on the government's behalf. A defendant who "seek[s] a new trial based on perjured testimony has the burden to show that (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019) (citation and internal quotation omitted). Hunter points to confusion and seeming contradictions in Rollins' testimony to support this claim. But even if Rollins gave confused testimony, Hunter fails to point to convincing evidence of perjury, much less perjury that the government knowingly proffered. We therefore conclude that this claim also fails.

2. *The Lack of a Curative Instruction for Investigator Strasser's Limited Testimony Was No Error*

Hunter believes that the district court should have administered a curative instruction to the jury advising it to disregard a portion of Strasser's trial testimony. The defense objected to Strasser's testimony on the grounds that the government never designated him as an expert or summary witness. The district court sustained the defense's objections and determined that Strasser could only testify to evidence in the case that he personally worked on or developed. However, before the objection, Strasser testified that he had viewed hundreds of examples of robbery footage and that generally criminals use the same tactics in each robbery. In his *pro se* brief, Hunter claims that the district court should have issued a curative instruction to advise the jury to disregard Strasser's brief, pre-objection testimony. The defense did not request a curative instruction at the time. Reviewing this on a plain error standard, Hunter's argument fails. *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012) (plain error requires that absent the error, the defendant probably would not have been convicted). Strasser's brief comments before the objection provided little information and could not have significantly prejudiced Hunter.

3. *The Government Presented Sufficient Evidence to Support Hunter's Convictions*

Hunter argues that the government failed to offer evidence to prove every element of his conviction under the Hobbs Act, which criminalizes robbery or extortion that affects commerce. *See* 18 U.S.C. § 1951(a). Hunter specifically claims that the government failed to prove that the robberies affected interstate commerce. However, the government only needs to show a *de minimis* effect on interstate commerce. *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000). Here,

the parties stipulated that the Roman's Food Market and the George Webb restaurant were businesses engaged in interstate commerce. Hunter was involved in robbing both stores, which temporarily shut down after the robberies. Therefore, the government provided sufficient evidence to satisfy the "affects commerce" element of the Act.

Hunter lastly argues that the government produced insufficient evidence to satisfy the *mens rea* element for the car jackings. Under 18 U.S.C. § 2119, a defendant must "inten[d] to cause death or serious bodily harm." Given the defendants' affinity for pistol-whipping their victims, we find it hard to see the basis for this argument. We previously explained that the defendant need not actually attempt to kill or harm the victim, but rather must possess a "conditional intent to do the driver harm had he not complied with the defendants' demands." *United States v Jones*, 188 F.3d 773, 777 (7th Cir. 1999). The Cadillac's driver testified that the two men who carjacked him forced him to the ground and struck him in the back of the head with a gun. With respect to the Ford Focus, the victim testified that Hunter pressed a firearm into his stomach and took his possessions, including his car. The government provided evidence that both instances involved threats backed by a deadly weapon. One instance involved serious physical harm. The government provided sufficient evidence to establish the *mens rea*.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.